| | |
|---|---|
| WILDERNESS WATCH, FRIENDS OF THE CLEARWATER, and WESTERN WATERSHEDS PROJECT<br><br>    Plaintiffs,<br><br>        v.<br><br><br>TOM VILSACK, U.S. Secretary of Agriculture; TOM TIDWELL, Chief, U.S. Forest Service; NORA RASURE, Regional Forester of Region Four of the U.S. Forest Service; CHARLES MARK, Salmon-Challis National Forest Supervisor; and VIRGIL MOORE, Director, Idaho Department of Fish and Game,<br><br>    Defendants. | Case No. 4:16-cv-12-BLW<br><br>**MEMORANDUM DECISION** |

## INTRODUCTION

The Court has before it cross motions for summary judgment filed by all parties here. The Court heard oral argument on the motions and took them under advisement. For the reasons set forth below, the Court will grant the motion filed by the plaintiffs and deny the motions filed by the defendants.

## SUMMARY OF DECISION

The Idaho Department of Fish and Game (IDFG) received approval from the Forest Service to use helicopters in the Frank Church Wilderness to tranquilize and

collar elk with monitors to trace their movements. Both agencies were concerned about reductions in the elk population in the Wilderness Area, and the project was designed to obtain data that might explain the mortality problem. Ignoring a prior directive of the Court, the Forest Service allowed the project to begin immediately, preventing plaintiff environmental groups from being able to timely seek injunctive relief. Within three days the IDFG project was completed, and 57 elk and 4 wolves were collared.

The environmental groups filed this lawsuit to prevent the IDFG from using the data and to require that it be destroyed. They complained that the IDFG obtained approval by proposing a small plan that hid the much larger impacts of their long-term plan. In this decision, the Court agrees, and holds that the Forest Service's approval of the project violated the National Environmental Protection Act (NEPA) and the Wilderness Act of 1964. The Court also finds that the IDFG violated the terms of the approval when it collared the wolves.

The Court will enjoin the Forest Service from considering the data collected, and will enjoin the IDFG from using the data in any way when it seeks future Forest Service approvals. Although the harm of having helicopter landings in the Wilderness Area has passed, there is ongoing harm because the IDFG continues to hold – and plans to use – data that was obtained in violation of federal law. The Court will therefore order the IDFG to destroy that data.

# BACKGROUND

In 1964, Congress passed the Wilderness Act to protect areas "untrammeled by man, where man himself is a visitor who does not remain." See 16 U.S.C. § 1131(c). The landing of aircraft, among other activities, is banned "except as necessary to meet minimum requirements for the administration of the area." See 16 U.S.C. § 1133(c).

In 1980, Congress created the Frank Church Wilderness, spanning 2.4 million acres, the largest forested wilderness in the lower 48 states. The enabling legislation – the Central Idaho Wilderness Act – stated that this area would be governed by the Wilderness Act.

Just two years earlier, in 1978, the gray wolf was declared to be an endangered species under the Endangered Species Act (ESA). To reintroduce the wolf to the Rocky Mountain area, the Fish and Wildlife Service released 35 gray wolves into the Frank Church Wilderness in 1995 and 1996.

The wolf recovery was extremely successful, their numbers increased dramatically, and they were delisted in 2009. The wolf packs were monitored by the Idaho Department of Fish and Game (IDFG), and in 2010, the agency petitioned the Forest Service to conduct helicopter monitoring in the Wilderness Area. The IDFG's plan was to shoot several wolves with tranquilizer darts from a helicopter and then affix telemetry collars that would allow the IDFG to monitor

their movements. The plan contemplated 20 helicopter landings in the Wilderness Area over a two-week period.

The Forest Service approved the IDFG's plan, prompting environmental groups to file a lawsuit in this Court to block the plan because helicopter landings were inconsistent with the wilderness values of the Wilderness Area. The case presented a "conundrum": The intrusive helicopter flights were inconsistent with wilderness values, but their purpose – to better understand the wolf – furthered wilderness values. *Wolf Recovery Foundation vs. U.S.,* 692 F.Supp.2d 1264, 1269-70 (2010). Ultimately, the Court was persuaded that the unique value of that particular study, coupled with the relatively small number of landings and short duration of the project, outweighed concerns over the disruption to wilderness values. But the Court made clear that its decision was not a free pass for further helicopter visits:

> [T]he next helicopter proposal in the Frank Church Wilderness will face a daunting review because it will add to the disruption and intrusion of this collaring project. The Forest Service must proceed very cautiously here because the law is not on their side if they intend to proceed with further helicopter projects in the Frank Church Wilderness. The Court is free to examine the cumulative impacts of the projects, and the context of the use. Given that this project is allowed to proceed, the next project will be extraordinarily difficult to justify.

*Id.* at 1270. The Court also put the Forest Service on notice that the agency "would be expected to render a final decision [on any helicopter project in the Wilderness Area] enough in advance of the project so that any lawsuit seeking to

enjoin the project could be fully litigated." *See Wolf Recovery Foundation v. U.S.,* *2010 WL 2898933 at \*1 (D. Id. July 21, 2010).* The agency would ignore that directive in the present case, as discussed further below.

Meanwhile, the IDFG was estimating elk populations in the Wilderness Area through aerial surveys that did not involve collaring but relied entirely on visual sightings from the air. According to those surveys – conducted every 5 to 10 years – the elk population in the Wilderness Area was declining rapidly. *FS000094.* The IDFG believed the decline of the elk in the Wilderness Area was due to wolf predation. They drafted a Predation Management Plan that called for, among other things, deploying professional trappers to kill 60% of the resident wolves. FS011015-011016.

To confirm their suspicions, the IDFG again asked the Forest Service to allow them to conduct helicopter landings in the Wilderness Area. Their initial plan, proposed in 2014, sought to collar both wolves and elk over a 10-year period. *FS000444 (attachment entitled "Minimum Requirements Decision Guide" at pg. 26).* The IDFG proposed making 160 helicopter landings in each of the first two years, and then 90 landings per year in the remaining years, for a total of 1,040 landings. *Id.* But the wolf collaring portion of that plan was later dropped, as noted by the Forest Service: "Wolves are off the table until [the IDFG can] gain understanding of elk." *FS000227.*

Focusing only on elk collaring, the IDFG submitted a new proposal seeking approval for 10 years of annual helicopter landings.  The IDFG wanted to study elk survival rates and population numbers by attaching radio collars to the elk and monitoring their movements.  The plan included 120 landings in each of the first two years and 70 landings per year thereafter for a total of 800 landings over a decade.  *FS000021.*

As an alternative, the IDFG proposed a shorter but more intensive 5-year program that would include 570 helicopter landings.  *FS000028.*  But the IDFG conceded that this shortened proposal did not allow enough time to obtain valid elk mortality data, and that "an extension beyond 5 years would be necessary."  *Id.*

The IDFG prepared a draft Minimum Requirements Analysis (MRA) that recognized both the need for elk monitoring and the disruption of wilderness values that would occur under either the 10-year or 5-year alternatives. That MRA was dated August 7, 2015.  *FS000003-44.*

The next day – August 8, 2015 – the IDFG submitted an even shorter proposal to conduct the elk collaring in a single year with just 120 helicopter landings.  *FS000061.*  The agency's goal was to capture and collar 60 elk over a 5-day period between December, 2015, and March, 2016.  The Forest Service noted the IDFG's reason for shortening the proposal: "While IDFG acknowledges longer term plans[,] they have taken [those plans] off the table for now and just are need

of getting elk off the ground." *FS000227.* It is this proposal that was ultimately

approved by the Forest Service and is now before the Court for review. The

proposal was formally presented for public comment on August 24, 2015. *FS

000091-107.*

The Forest Service was fully aware that the IDFG was still pursuing a long-

term elk collaring project, and concluded that continued elk collaring beyond the 1-

year period was "[r]easonably foreseeable." *FS000107.* The Forest Service noted

in another document that the "[f]oreseeable future is a 10-year elk collaring by

IDFG . . . ." *FS 000228.*

This conclusion was inescapable given the IDFG's own concession that even

a 5-year collaring program was not sufficient to obtain valid data. There was never

any question that the IDFG's ultimate goal was to obtain 10 years of data through

roughly 800 helicopter landings.

After receiving public comment, the Forest Service prepared an

Environmental Assessment (EA) evaluating the IDFG's one-year elk collaring

proposal. The EA process required the Forest Service to evaluate the cumulative

impacts of this proposal along with other foreseeable impacts, and the Forest

Service conducted that analysis in § 3.2.2.2 of the EA:

> Continued long-term elk collaring activities in the [Wilderness Area]
> have been identified as a reasonably foreseeable future action. If
> continued elk collaring activities were to occur, cumulative effects
> would be high (noticeable and affecting more than two qualities of

wilderness character), extended (throughout the project area and indirectly affecting adjacent wilderness lands), long-term to permanent (if operations were to occur longer than 5 years), and unique (affecting lands protected by legislation to preserve wilderness character). Such a project has the potential to change the untrammeled, undeveloped, natural, and outstanding opportunities qualities of wilderness character in the [Wilderness Area] for years to come, even though the bulk of the operations would occur over just a few days each winter. Effects would be especially pronounced during the winter months when helicopter landings would take place, but indirect effects to wilderness character would persist year-round for many years (such as collars on elk). Adverse cumulative impacts would also occur to non-use wilderness values, especially to bequest value. Indirect beneficial effects to natural character could have long-term to permanent cumulative effects if the data collected were to result in management decisions that improve the [Wilderness Area] resource as a whole and not just one species or one component of wilderness character.

*FS011757.* This analysis recognized that if the IDFG's elk collaring were to continue for more than 5 years, the cumulative adverse effects on wilderness values would be "high" and "extended." *Id.* The record, discussed above, demonstrates beyond dispute that the IDFG intends to seek 10 years of helicopter landings to collar elk in the Wilderness Area.

Yet the Forest Supervisor essentially ignored this when he approved the IDFG's proposal in his Decision Notice. His one-sentence analysis of the cumulative effect criteria states as follows: "Section 3 of the EA discloses that the [IDFG's proposal] will not result in any known significant, temporary, short term, long term, or cumulative effects." *FS014529.* Based on that finding, and others, the Forest Supervisor concluded that an environmental impact statement (EIS) was

not required because the IDFG proposal was not "a major federal action that would significantly affect the quality of the human environment either individually or cumulatively." *FS014527.*

Instead of allowing time for challenges before implementation of his decision, as directed by the Court in prior litigation, the Forest Supervisor ruled that "[i]mplementation may begin immediately following approval of necessary permit(s)." *FS014530.* The Forest Service issued its temporary special use permit on January 6, 2016, and the IDFG began its operations the next day, January 7, 2016. Within two days the agency was done, having collared 57 elk using 112 helicopter landings in the Wilderness Area.

But in this same operation, the IDFG also collared 4 wolves, in violation of the temporary special use permit that only allowed them to collar elk. IDFG staff unaffiliated with the project "conducted an internal review to determine whether or not the action was intentional and concluded it was not." *See Gould Affidavit (Dkt. No. 35)* at ¶ 13. The wolf collars cannot be remotely turned off and "will keep transmitting so long as the battery and collar systems function." *Id.* at ¶ 15. The IDFG intends to keep using the wolf collar data to "make informed wildlife management decisions, including appropriate hunting seasons, and to provide technical information and recommendations to [the Forest Service] on wildlife

habitat issues." *Id.* One of the wolves has since died, and so only 3 collared wolves remain.

The plaintiffs responded quickly by filing this lawsuit against the Forest Service on January 7, 2016, to stop the helicopter project on the grounds that it violated the Wilderness Act and NEPA. But the IDFG completed its collaring operations before any hearing could be held. Realizing that the project was completed, the plaintiffs filed an amended complaint, adding as a defendant Virgil Moore, the IDFG Director, and adding a prayer for relief seeking an injunction requiring the IDFG to destroy all data obtained from the radio collars placed on elk and wolves during this project, and specifically prohibiting the IDFG from using the data to advance IDFG's plans to kill wolves in the Middle Fork Zone of the River of No Return Wilderness.

During oral argument, the Forest Service's counsel stated that the Forest Service had sent the IDFG a "notice of non-compliance" for their collaring of wolves. But the Forest Service did not plan on taking any further action against the IDFG.

## ANALYSIS

### Mootness

Defendants argue that plaintiffs' claims are moot because the helicopter collaring project has been completed. But "completion of activity is not the

hallmark of mootness." *Neighbors of Cuddy Mountain v. Alexander,* 303 F.3d 1059, 1065 (9th Cir. 2002). To the contrary, "a case is moot only where no effective relief for the alleged violation can be given," including relief "to help mitigate the damage cause by" the challenged action. *Id.* at 1065-66. Here, effective relief could be granted to plaintiffs. They seek injunctive relief to prevent the use of – and to destroy – data gained from the project. Thus, the project is not moot.

But even if there was no effective relief to be granted, the dispute here would not be moot because it will occur again and will evade review again. This exception to the doctrine of mootness applies where (1) the duration of the challenged action is too short to be fully litigated, and (2) there is a reasonable likelihood that the same party will be subject to the action again. *Shell Offshore v. Greenpeace,* 709 F.3d 1281, 1287 (9th Cir. 2013). As discussed above, IDFG has a long-term plan to pursue hundreds of helicopter collaring landings in the Wilderness Area and has stated that it does not need Forest Service approval for those landings. There is thus no doubt that IDFG will attempt again the very same project it completed here. Moreover, the duration will once again be too short for plaintiffs to challenge – the Forest Service ignored the Court's earlier directive to allow time for challenges, and thus the Court cannot trust its assurances that sufficient time will be granted in the future.

For all these reasons the Court rejects defendants' mootness arguments.

## NEPA

The Court's review of the Tribes' NEPA claim is governed by the
Administrative Procedures Act (APA). *See Klamath Siskiyou Wildlands Center v.
Boody,* 468 F.3d 549 (9th Cir. 2006). Under the APA, the Court may set aside
agency action only if it is "arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Review under the arbitrary and capricious standard is narrow and the Court
cannot substitute its judgment for that of the agency. *Lands Council v. McNair,*
629 F.3d 1070 (9th Cir. 2010). A decision is arbitrary and capricious only if the
agency relied on factors Congress did not intend it to consider, entirely failed to
consider an Important aspect of the problem, or offered an explanation that runs
counter to the evidence before the agency or is so implausible that it could not be
ascribed to a difference in view or the product of agency expertise. *Id.* Agency
action is valid if the agency "considered the relevant factors and articulated a
rational connection between the facts found and the choices made." *Id.*

NEPA requires that an environmental impact statement (EIS) must be
prepared for every "major federal action significantly affecting the quality of the
human environment." 42 U.S.C. § 4332(2)(C). However, if, as here, an agency's
regulations do not categorically require the preparation of an EIS, then the agency

must first prepare an Environmental Assessment (EA) to determine whether the action will have a significant effect on the environment. See 40 C.F.R. § 1501.4. If the EA establishes that the agency's action may have a significant effect upon the environment, an EIS must be prepared. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir.1998). If not, the agency must issue a Finding of No Significant Impact (FONSI), *see* 40 C.F.R. §§ 1501.4, 1508.9, accompanied by "a convincing statement of reasons to explain why a project's impacts are insignificant." *Blue Mountains*, 161 F.3d at 1212.

NEPA regulations guide the inquiry into whether the project at issue here may have a significant impact. Those regulations, promulgated by the Council on Environmental Quality ("CEQ"), require consideration of two broad factors: "context and intensity." *See* 40 C.F.R. § 1508.27; 42 U.S.C. § 4332(2)(C). Context refers to the setting in which the proposed action takes place. *Id.* at § 1508.27(a). Intensity means "the severity of the impact," and involves examining ten factors:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or

threatened species or its habitat that has been determined to be critical under the

Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or

requirements imposed for the protection of the environment.

*See* 40 C.F.R. § 1508.27(b). The presence of "one of these factors may be

sufficient to require preparation of an EIS in appropriate circumstances." *Ocean*

*Advocates v. U.S. Army Corp of Engineers*, 402 F.3d 846 (9th Cir. 2005).

The Court will turn to examine the EA's evaluation of the intensity of the

impact, and specifically its analysis of the cumulative impact factor.

## NEPA – Cumulative Impact

The seventh factor listed above required the Forest Service to evaluate

whether the IDFG's proposed one-year elk collaring project was "related to other

actions with individually insignificant but cumulatively significant impacts.

Significance exists if it is reasonable to anticipate a cumulatively significant impact

on the environment." See 40 C.F.R. § 1508.27(b)(7). A cumulative impact is an

"impact on the environment which results from the incremental impact of the

action when added to other . . . reasonably foreseeable future actions . . . ." 40

C.F.R. § 1508.7.

As discussed above, the IDFG had stated that even a five-year collaring operation was not sufficient to obtain the data necessary for the IDFG's purposes. As the Court found above, the record demonstrates that there was never any doubt that the IDFG's plan is to pursue hundreds of helicopter landings to collar elk in the Wilderness Area. These circumstances demonstrate that it was "reasonably foreseeable" that the IDFG would seek further helicopter landings, and the EA, as quoted above, even recognized this reality.

An EA's analysis of cumulative impacts "must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment." *Te-moak Tribe of Western Shoshone of Nevada v. U.S.,* 608 F.3d 592, 602 (9th Cir. 2010). This cumulative analysis "must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *Ocean Advocates,* 402 F.3d at 868.

Here, the EA and FONSI essentially allowed the IDFG to get away with slicing its long-term helicopter collaring project into a one-year sliver of a project to mitigate the cumulative impacts. This is precisely what the CEQ regulations prohibit. *Id.* The failure to take a "hard look" at this seventh factor in the intensity analysis means, by itself, that the EA and FONSI violate NEPA. *Id.* But there is another factor that was ignored – factor six.

**NEPA – Precedent**

The sixth intensity factor required the Forest Service to evaluate the degree to which the IDFG's proposal may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration. The Forest Service approval of this one-year project certainly set a precedent for approval of similar projects in the future, giving the IDFG incentive to continue slicing its long-term project into one-year slivers.

**NEPA – Ecologically Critical Areas**

The third factor in determining whether an EIS is required is the "unique characteristics of the geographic area such as proximity to . . . ecologically critical areas." *See* 40 C.F.R. § 1508.27(b)(3). This factor is triggered because the project took place in the Wilderness Area.

**NEPA – Conclusion**

In conclusion, three important factors – cumulative impacts, precedent, and an ecologically critical area – were present, any one of which would have triggered the preparation of an EIS rather than an EA. The Forest Service therefore violated NEPA by failing to prepare an EIS.

**Wilderness Act**

The land protected by the Wilderness Act is "untrammeled by man, where man himself is a visitor who does not remain." See 16 U.S.C. § 1131(c). The

landing of aircraft, among other activities, is banned "except as necessary to meet minimum requirements for the administration of the area." *See* 16 U.S.C. § 1133(c).  This statutory provision "requires, among other things, that the Forest Service make a finding of 'necessity' before authorizing [otherwise prohibited activities] in wilderness areas." *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 646 (9th Cir. 2004).

This prohibition is one of the strictest prohibitions in the Act. *See Wilderness Watch,* 629 F.3d at 1040. "The limitation on the Forest Service's discretion to authorize prohibited activities only to the extent necessary flows directly out of the agency's obligation under the Wilderness Act to protect and preserve wilderness areas." *High Sierra Hikers Ass'n*, 390 F.3d at 647.  However, the Ninth Circuit has recognized that ultimately:

> the Wilderness Act requires a delicate balancing between Congress' desire to maintain lands untouched by humans and Congress' recognition that such an idealistic view is subject to some practical limitations.

*Wilderness Watch*, 629 F.3d at 1033, 1039–40 (recognizing that Congress "did not mandate that the Service preserve the wilderness in a museum diorama . . . [i]nstead, Congress stated that the wilderness was to be preserved as wilderness and made accessible to people, devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical uses."); *see also Wolf Recovery*, 692 F.Supp.2d at 1269 (the Act "could have directed that the area

remain entirely wild and unmanaged, but it did not take that path"). In fact, the required analysis for Wilderness Act compliance allows an agency to determine that another purpose consistent with the Act is more important than maintaining pristine wilderness, but in doing so the agency must make the requisite findings. *High Sierra Hikers Ass'n*, 390 F.3d at 647.

But in this case, the IDFG's Director, Virgil Moore, argues that the State "does not need federal approval to place radio-collars on elk or wolves, or to take control actions on wolves in the Frank Church Wilderness." *See State Reply Brief (Dkt. No. 48)* at p. 6. To support this claim, Director Moore points to a savings clause in the Wilderness Act stating that "[n]othing in this chapter shall be construed as affecting the jurisdiction or responsibilities of the several States with respect to wildlife and fish in the national forests." *See* 16 U.S.C. § 1133(d)(7). While this language preserves a State's right to manage wildlife in the Wilderness Area, Congress did not mean "to eviscerate the primacy of federal authority" over the Wilderness Area. *See National Audubon Society, Inc. v. Davis,* 307 F.3d 835, 854 (9th Cir. 2002) (interpreting similar language in National Wildlife Refuge System Improvement Act). The "overarching purpose" of Congress in passing the Wilderness Act was to preserve the "wilderness character" of that land. *High Sierra Hikers Ass'n,* 390 F.3d at 648. Congress made preservation of wilderness values "the primary duty of the Forest Service, and it must guide all decisions as

the first and foremost standard of review for any proposed action." *Greater Yellowstone Coalition v. Timchak*, 2006 WL 3386731 at *6 (D.Idaho Nov. 21, 2006).

In other words, the IDFG must obtain approval from the Forest Service before undertaking a project in the Wilderness Area. And that means that any action taken by the IDFG without Forest Service approval would be contrary to the Wilderness Act. It also means that before any approval can be granted, the Forest Service must first make the "necessity" finding discussed above.

In this case, the Forest Service could not make an informed "necessity" finding because it was only looking at a one-year portion of a much larger long-term plan. As discussed above, the Forest Service had allowed the IDFG to divide up its project into a smaller proposal that hid the true nature of the impacts. Thus, the Forest Service failed to make the "necessity" finding required by the Wilderness Act.

**Eleventh Amendment**

Director Moore claims immunity under the Eleventh Amendment. The Court rejects that claim.

The plaintiffs seek only injunctive relief against Director Moore, and do not seek any monetary relief from the State. The Eleventh Amendment protects the State against federally-based claims for monetary relief that will necessarily be

borne by the State's treasury. *See Pennhurst State School & Hosp. v. Halderman,* 104 S. Ct. 900, 909-11 (1984). There are no such claims here.

Moreover, the supremacy clause mandates that federal courts have the power to enjoin state officials for violations of federal statutes. *Almond Hill School v. United States Dep't of Agric.*, 768 F.2d 1030, 1034 (9th Cir.1985). More specifically, "[n]onfederal actors may . . . be enjoined under NEPA if their proposed action cannot proceed without the prior approval of a federal agency." *Fund for Animals, Inc. v. Lujan,* 962 F.2d 1391, 1397 (9th Cir. 1992). As discussed above, the IDFG must seek approval from the Forest Service before proceeding with any helicopter landings in the Wilderness Area. Thus, Director Moore's claim of Eleventh Amendment immunity must be rejected pursuant to *Fund for Animals.*[1]

## Injunctive Relief

The Court has found above that the Forest Service violated NEPA and the Wilderness Act in approving the helicopter elk collaring project proposed by the IDFG. The IDFG also violated the terms of that approval by collaring wolves. As a result of the project, the IDFG is gathering data on 57 elk and 3 wolves. The

---

[1] Director Moore was properly joined under Rule 19(a).

plaintiffs ask the Court to enjoin the IDFG's use of the data and to order its destruction.

A plaintiff seeking a permanent injunction must demonstrate (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010). Here, the injury to the plaintiffs' interest in the wilderness character of the Wilderness Area is real and cannot be compensated for by a monetary award. The balance of hardships tips toward plaintiffs because the elk collaring data was gathered in violation of NEPA and the Wilderness Act. The public interest demands that there be consequences for the violations of these laws.

For all these reasons, permanent injunctive relief is warranted under *Geerston.* The Court will enjoin the Forest Service from considering any of the data gathered from the elk and wolves as a result of this project. The Court will also enjoin the Forest Service from approving any future helicopter projects without delaying implementation for 90-days to allow affected groups to file challenges to the projects.

With regard to the defendant Director of the IDFG, the Court will enjoin the Director from using any of this data in further proposals seeking approval from the Forest Service. The plaintiffs ask the Court to go further and order that the Director destroy the data gathered in this project. A mandatory injunction "orders a responsible party to take action." *Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015). Mandatory injunctions are "particularly disfavored" and may not be granted "unless extreme or very serious damage will result." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,* 571 F.3d 873, 878 (9th Cir. 2009). Further, a court should not enter a mandatory injunction in doubtful cases or where the injury complained of is compensable by monetary damages. *Id*.

This is the rare or extreme case where a mandatory injunction is required. The IDFG has collected data in violation of federal law and intends to use that data to seek approvals in the future for more helicopter landings in the Wilderness Area. While the helicopter landings represent harm that has passed, the IDFG's possession of the data constitutes an ongoing harm that continues to this day and beyond. The only remedy that will directly address the ongoing harm is an order requiring destruction of the data – no monetary award or other such sanction will alleviate the ongoing harm. Thus, the Court will issue a mandatory injunction ordering the Director to destroy the data received on the elk and wolves collared in this project.

The Court will issue a separate Judgment with these rulings as required by Rule 58(a).

DATED: January 18, 2017

B. Lynn Winmill
Chief Judge
United States District Court